In re Gordon Ross **WEBB** and Marilyn Anne Webb, Debtors.

**Bankruptcy No. 882–82799–20.**

United States Bankruptcy Court, E.D. New York.

April 18, 1983.

---

George B. McPhillips, Mineola, N.Y., for debtors; Donna M. Brady, Mineola, N.Y., of counsel.

Joseph Rubin, Smithtown, N.Y., for Ronald and Patricia Mayer; Keith Rothman, Smithtown, N.Y., of counsel.

Richard J. McCord, Glen Cove, N.Y., trustee.

## MEMORANDUM

ROBERT JOHN HALL, Bankruptcy Judge.

The Court has before it the chapter 13 plan, 11 U.S.C. § 1301 *et seq.* (Supp. IV 1980), of Marilyn and Gordon Webb (the debtors) and the objections thereto of Richard McCord, the standing chapter 13 Trustee, and of Ronald and Patricia Mayer (the Mayers), the second mortgagee of the debtors.

### The Trustee's Objection

The Trustee's objection is based on the debtors' attempt to exempt $20,000 in the equity of their principal residence under N.Y.C.P.L.R. § 5206(a) (McKinney 1978). The Trustee relies on this Court's prior decision, *In re Feiss,* 15 B.R. 825 (Bkrtcy.E.D.N.Y.1981) for the proposition that joint debtors can exempt no more than $10,000 in equity under that section and therefore moves to deny confirmation.[1]

---

1. The debtors conceded that if they were limited to $10,000 under section 5206(a) then the plan would not be paying the creditors at least

In *Feiss,* this Court examined into the legislative and case law history of C.P.L.R. § 5206(a) and concluded that, as a matter of New York law, while either joint tenant could employ the $10,000 exemption, it could not be aggregated. 15 B.R. at 828. Moreover, this Court rejected the argument that 11 U.S.C. § 522(m) mandated a different result as a matter of federal law, *id.,* although the Court recognized that the question might be a more difficult one in the event that New York "opted out" of the federal exemption scheme, *id.* As of September 1, 1982, New York has opted out, Ch. 540, § 284 [1982] N.Y.Laws 1407 (McKinney) (the opt-out law) and the Court has been asked to re-evaluate *Feiss* in light thereof.

The debtors, relying on cases such as *In re Rizzo,* 21 B.R. 913, 915 (Bkrtcy.W.D.N.Y. 1982) argue that 11 U.S.C. § 522(m) is a substantive provision of federal law mandating the creation of state law exemptions even where none may have existed before so that each debtor in a joint case may have available the same exemptions. Although the Court has serious reservations as to whether that is what section 522(m) means,[2] the Court need not address that question.

as much as they would receive under a chapter 7 proceeding. *Cf.* 11 U.S.C. § 1325(a)(4).

2. Section 522(m) provides:
   This section [referring to available exemptions] shall apply separately with respect to each debtor in a joint case.
11 U.S.C. § 522(m). The legislative history to this section, if it tells anything, indicates that section 522(m) was never intended by Congress as mandating a doubling of exemptions.

Both the House and Senate versions of the Code contained identical versions of what was to become section 522(m). *Compare* section 522(n) of H.R. 8200, 95th Cong., 1st Sess. (1977) *with* section 522(l) of S. 2266, 95th Cong.2d Sess. (1978).

On the Senate side, it is clear that the provision was not intended to enable joint debtors to double their homestead exemptions.

The Senate version of the Code would have limited debtors to state law exemptions, while the House version created federal exemptions and would have allowed debtors to elect between the federal or state scheme. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 6, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5792; *compare* H.R. 8200 § 522 *with* S. 2266 § 522. The Senate was concerned, however, that the House version would allow one joint debtor to elect the federal exemptions while the other joint debtor elected the state exemptions thereby creating an "instant affluence." S.Rep. No. 989, 95th Cong. 2d Sess. 6, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5792. But when one couples this fear with the observation that many states had homestead exemptions even more liberal than the proposed federal exemption, one must conclude that the Senate could not have intended section 522(m) as enabling joint debtors to aggregate their homestead exemptions. For if section 522(m) was so intended, many joint debtors would have been able to exempt more by doubling their state homestead exemptions then by one choosing the federal and the other the state exemption as authorized by the complained of House bill. Accordingly, it must be concluded that the Senate intended section 522(m) to do no more than state the rule that in a joint case, although technically one proceeding, each debtor would be entitled to those exemptions available under state law: no more, no less.

Similarly, although it is clear that the House took a far more liberal stance than the Senate concerning bankruptcy exemptions, there is nothing in the legislative history of the Code to indicate that the House intended their version of section 522(m) as authorization for joint debtors to double available state homestead exemptions. In fact the House solution to the perceived inadequacy of state exemptions was the creation of the federal exemption scheme, not a rewriting of state law. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 126 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 6087. Accordingly, the House Report on what was to become section 522(m) stated only that the section entitled joint debtors to independently choose the federal or state exemption scheme. *Id.* at 363, U.S.Code Cong. & Ad.News at 6319. In this Court's opinion that was all that was intended by the House.

The House-Senate compromise, of course, did create a set of federal exemptions, albeit at a somewhat reduced level; but then also allowed the states to prohibit their debtors from electing that scheme at all. 124 Cong.Rec. S17412 (daily ed. October 6, 1078) (remarks of Sen. DeConcini); *id.* at H11095 (daily ed. September 28, 1978) (remarks of Rep. Edwards); *see* 11 U.S.C. § 522(b) & (d) (Supp. IV 1980). Based thereon, it has been held that it was the Senate's view on exemption legislation that prevailed. *In re Sullivan,* 680 F.2d 1131, 1135–36 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982).

In sum the Court has found nothing to indicate that Congress envisioned section 522(m) as an authorization for joint debtors to double their state's homestead exemption.

As a final point, it should be noted that the statements in cases such as *Rizzo* and *Cheese-*

That is because it is the function of a court to interpret the law so as to effectuate both Congress' and the New York Legislature's intentions. To that end, the Legislature's purpose must be divined. It is only after that legislative purpose has been determined and found to be in real or apparent conflict with federal law that the parameters of a provision such as section 522(m) would have to be plumbed. In the instant case, based on the Court's conclusion that the New York Legislature intended that joint debtors filing bankruptcy after September 1, 1982 could aggregate their homestead exemption,[3] the Court finds not even an apparent conflict to be resolved. Accordingly, the Court never reaches the issue of section 522(m)'s meaning.

### The Opt-Out Law

■ Congress clearly delegated the power to regulate bankruptcy exemptions to all those states which wished to exercise it, 11 U.S.C. § 522(b)(1); see In re Sullivan, 680 F.2d 1131, 1137 (7th Cir.1982) and New York has elected to exercise that power. That being the case, the initial inquiry must be into what the New York Legislature envisioned when it opted-out of the federal scheme. Clearly, the Court cannot resolve possible federal-state conflicts until it decides that such conflicts exist.

The legislative history to the New York opt-out law is hardly a model of precision. Be that as it may, a Memorandum in Support prepared by Assemblyman Robach, one of the sponsors of the bill, stated: ·

This bill would reassert New York's exemptions with modifications. These modifications address abuses in the law and protect the vast majority of debtors in need of a fresh start. In addition to extending an exemption of $2400 above liens and encumbrances for an automobile, which is twice the present federally allowed amount, the exemptions provided by this measure are more lenient than those now allowed in 40 other states. *For example, for a husband and wife filing jointly, in excess of $35,000 in real and personal property may be declared exempt under its provisions, not including specific entitlements.*

(Emphasis added). Inasmuch as in this Court's experience, few joint debtors enter bankruptcy with more than a few thousand dollars in personal property, it would appear that the sponsor's projections of $35,-000 in exemptions must assume an aggregating of the homestead exemption.

Moreover, this conclusion is confirmed by the record of the debate in the Assembly where repeated reference was made to the proposition that joint debtors could exempt $20,000 in the equity in their homes in a bankruptcy proceeding.[4] Whether that was an accurate statement of the case law in May 1982 is beside the point: when New York opted-out, a $20,000 homestead exemption was an assumption of the bill. Accordingly, for this Court to apply section 5206 as interpreted prior to New York's

---

man v. Nachman (In re Cheeseman), 656 F.2d 60 (4th Cir.1981) on which Rizzo relied that section 522(m) mandated a doubling of state exemptions were pure dictum for in neither case was such a doubling authorized.

**3.** In the instant case, the debtors filed on November 10, 1982.

**4.** MR. SALAND: George, I am not a bankruptcy practitioner. Maybe you can help me. Assume the following: Assume that I own a home jointly with my wife. I have a $50,000 mortgage, and I have $30,000 in equity. Assuming that I file for bankruptcy, does the trustee sell the house and I am entitled to $20,000 under the joint bankruptcy and any equity that exceeds the $20,000 goes into the kitty?

MR. FRIEDMAN: Theoretically, that could happen. What normally happens, Steve, is that the bankrupts work out an arrangement with a trustee so that they are able to remain in the house. In your case, if both you and your wife filed the petition in bankruptcy, most courts would agree that you are entitled to a $20,000 exemption, two times the ten, and you would go to the bankruptcy trustee and say, "As far as the equity over and above the exemption, we will work something out with you, and pay it off over a limited period of time", and remain in the house. As a matter of fact, Steve, I have never seen a bankrupt kicked out of a home under normal circumstances like that.
Record of Proceedings in New York Assembly, May 17, 1982 at 5364–65.

opting-out would be to interpret the statute in a way unenvisioned by the Legislature and presumably in derogation of their goals. That is not the role of a court.

Consequently, the Court concludes that the New York Legislature intended to allow its debtors to aggregate their homestead exemptions in bankruptcy proceedings and therefore dismisses the Trustee's objection to the plan.

### The Mayers' Objection

The Mayers, as second mortgagee on the debtors' principal residence, object to the plan based on the proposed payments. Specifically, the Mayers contend that the mortgage note provides for the continuance of 24% interest[5] even after a default, that 11 U.S.C. § 1322(b)(2) prohibits the modification of this right, and therefore, the Mayers conclude, the debtors' proposal to cure the mortgage arrearages and expenses at only 12% interest is improper.[6]

### The Note

The note in question provides:

Upon failure of the Borrower to pay any installment when due hereunder ... Lender may immediately, without notice, declare the entire remaining unpaid principal balance *and all earned interest* and accrued late charges due and payable without notice to the Borrower and, thereafter, *such total* so declared due and payable shall bear interest at the rate of twenty-four (24) percent per annum until paid.

Note dated August 6, 1980 at 2 (emphasis added).

It should also be noted that this note and mortgage was in fact foreclosed to judgment on September 29, 1982, and the debtors are attempting to reinstate it pursuant to 11 U.S.C. § 1322(b)(3) & (5); *see DiPierro v. Cullen (In re Taddeo),* 685 F.2d 24 (2d

Cir.1982); *In re Acevedo,* 26 B.R. 994 (E.D. N.Y.1982).

Section 1325 provides in pertinent part:
(a) The court shall confirm a plan if—

.        .        .        .        .

(5) with respect to each allowed secured claim provided for by the plan—

.        .        .        .        .

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim ....

11 U.S.C. § 1325. Section 1322, on the other hand, provides in pertinent part:
(b) Subject to subsections (a) and (c) of this section, the plan may—

.        .        .        .        .

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...

.        .        .        .        .

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

11 U.S.C. § 1322. Finally, section 506(b) provides:
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any

---

**5.** The second mortgage was given to secure the debtors' guaranty of a loan by the Mayers to the debtors' wholly owned corporation, Webb Appraisal Associates, Ltd. The issue of usury was not raised.

**6.** The Mayers also contended that their claim properly includes $1000 for legal fees in the foreclosure action and $350 for legal fees in this proceeding. The debtors have objected to these amounts. However, inasmuch as a hearing must be had on the interest issue, the resolution of these matters can await that hearing.

reasonable fees, costs or charges provided under the agreement under which such claim arose.

11 U.S.C. § 506(b); *cf. also id.* at § 103(a) (chapter 5 applies in chapter 13).

Based on these apparently inconsistent provisions, the case law has split on the question of their proper reconciliation.

■ Some Courts, relying on the punctuation employed in section 506(b), have ruled that that section only entitles the oversecured creditor to interest at the legal rate notwithstanding the language of the contract. *See, e.g., In re Marx,* 11 B.R. 819 (Bkrtcy.S.D.Ohio 1981); *In re Minguey,* 10 B.R. 806, 807 (Bkrtcy.W.D.Wis.1981). Other Courts, while not so limiting section 506(b), have held that in chapter 13 section 506 serves only to fix the secured creditor's total claim as of confirmation, while section 1325(a)(5) creates in the secured creditor a right independent of contract to receive a fair market interest rate on that deferred claim. *See, e.g., In re Klein,* 10 B.R. 657, 661 (Bkrtcy.E.D.N.Y.1981).[7] Finally, some Courts, have held that the question of whether interest under section 1325(a)(5) must be the contract, as opposed to, the market rate turns on whether the secured party is secured only by a security interest in the debtor's principal residence. *See, e.g., In re Simkins,* 16 B.R. 956 (Bkrtcy.E.D. Tenn.1982); *cf.* 11 U.S.C. § 1322(b)(2).

However, before the Court can address these questions, it must first determine what the contract provides, and whether it is valid under New York law[8] for a contract claim invalid under state law is invalid in bankruptcy. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring).

■ Initially, it must be noted that the note provides for the payment of interest on interest in the event of a default. *See*

*supra.* However, "[f]or a century the New York Court of Appeals consistently has held that a contractual provision to pay interest on interest is void under the law of New York." *Debentureholders Protective Committee v. Continental Investment Corp. (In re Continental Investment Corp.),* 679 F.2d 264, 271 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982) (*citing Giventer v. Arnow,* 37 N.Y.2d 305, 333 N.E.2d 366, 372 N.Y.S.2d 63 (1975); *Newburger-Morris Co. v. Talcott,* 219 N.Y. 505, 114 N.E. 846 (1916); *Young v. Hill,* 67 N.Y. 162 (1876)). Accordingly, the Mayers cannot rely on the note provision as entitling them to 24% interest on the accrued interest.

■ Moreover, the Court concludes that the language of the note fails to justify awarding the Mayers 24% interest on the principal arrearage. The note provides for 24% interest on the principal. It provides further for an acceleration of the principal in the event of a default together with the continuation of interest at 24%. Nowhere, however, does the note provide the remedy where, as here, the principal of the note is accelerated and then de-accelerated in a chapter 13 plan. Accordingly, under the doctrine that an instrument is construed against its draftsman, *Rentaways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 348, 126 N.E.2d 271 (1955); *cf.* N.Y.U.C.C. § 3–119, Official Comment 3 (McKinney 1964) (note is a contract) the Court finds the note's language does not support the Mayers' construction.

*The Code*

■ Assuming, *arguendo,* that this Court found the note's language sufficient to manifest an agreement that de-accelerated accrued principal would still accrue interest at 24% per annum until repaid, the

---

**7.** Some cases have held that there is a presumption that the rate required by 11 U.S.C. § 1325(a)(5) and the contract rate are the same. *See In re Klein,* 10 B.R. 657, 661 (Bkrtcy.E.D.N.Y.1981); *In re Smith,* 4 B.R. 12, 13 (Bkrtcy.E.D.N.Y.1980). This Court disa-

grees. The legislative history relied on by *Klein* and *Smith* had nothing to do with this issue.

**8.** The note provides that it is governed by the law of New York.

Court would not find that contractual provision binding on it. First, because it is federal and not state law which determines the allowance of interest in bankruptcy proceedings, *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 162–63, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946); *Debentureholders,* 679 F.2d at 271; and second, because the Court holds that section 1325(a)(5) entitles the secured creditor to receive, independently of his contract, interest payments sufficient to equate the deferred total paid to his present claim, *In re Hibbert,* 14 B.R. 891, 894 (Bkrtcy.E.D.N.Y. 1981). In other words, section 1325(a)(5) requires that the secured creditor receive not less than the present value of his allowed claim. Section 506, on the other hand, fixes that allowed secured claim, *In re Klein,* 10 B.R. 657, 661 (Bkrtcy.E.D.N.Y. 1981). Therefore, as of the confirmation date, section 506(b) incorporates contractual provisions to fix the total secured claim. Thereafter, the Court, independently of the contract, must fix an interest factor such that the total of such deferred payments is equivalent to the receipt of the total claim today. *In re Hibbert,* 14 B.R. 891, 894 (Bkrtcy.E.D.N.Y.1981); *In re Smith,* 4 B.R. 12, 13 (Bkrtcy.E.D.N.Y.1980). By this method the secured party's rights are not modified but protected.

For example, if there is an arrearage "X" under a secured transaction, that implies that the secured party envisioned having $X in his hand today. If he had those dollars in his hand, he would invest them in today's market at whatever rate was available to him now regardless of at what rate he had originally contracted for with the original debtor.

Accordingly, in the instant case, the Court will hold a hearing on April 28, 1983 at 9:30 A.M. for the purpose of determining what investment opportunities are available to the Mayers if they had their total claim in hand today.