In the Matter of John C. MAIMONE and Raffaela Maimone, a/k/a Lena Maimone, Debtors.

John C. MAIMONE and Raffaela Maimone, Plaintiffs,

v.

COLUMBIA SAVINGS BANK, Howell State Bank and Beinhauer Rouhana & Pike, P.A., Defendants.

Bankruptcy No. 80–04406.
Adv. No. 82–0251–TS.

United States Bankruptcy Court, D. New Jersey.

July 30, 1984.

Gross & Novak by Roger Steffens, East Brunswick, N.J., for trustee.

Markowitz & Zindler by Joseph Markowitz, Lawrenceville, N.J., for Citizens State Bank.

Kleinberg Moroney Masterson & Schachter, P.C. by Harold M. Cohen, Millburn, N.J., for debtors.

McDonough, Murray & Korn, P.C. by Jay Scott MacNeill, Westfield, N.J., for Beinhauer Rouhana & Pike, P.A.

Morrison & Morrison by Gloria B. Cherry, Hackensack, N.J., for Columbia Sav. & Loan Ass'n.

Riker Danzig, Scherer & Hyland by Karen Bezner, Morristown, N.J., for Howell State Bank.

## OPINION

AMEL STARK, Bankruptcy Judge:

This motion raises the important question, among others, of whether post-petition interest on a senior secured claim should be subordinated to the pre-petition claim of a junior secured creditor.

### Facts and Procedural History

1. John C. Maimone and Raffaela Maimone, the Debtors, filed a petition for relief under Chapter 11 of the Bankruptcy Code on October 20, 1980.

2. Real property owned by the Debtors in issue in this action comprises approximately 148 acres located in Marlboro Township, Monmouth County, New Jersey and is identified as Lots 2, 3, 4 and 4Q, Block 46, on the official tax map of Marlboro Township. This will be referred to as the Marlboro property.

3. Four separate complaints have been filed in these proceedings relating to the Marlboro property, as follows.

a. On January 22, 1982, Citizens State Bank ("Citizens") filed a Complaint (Adversary No. 82–0128) to vacate automatic stay pursuant to section 362 of the Bankruptcy Code to allow Citizens to proceed with a Sheriff's Sale of the Marlboro property, pursuant to a judgment of foreclosure and writ of execution issued by the Superior Court of New Jersey, Chancery Division, Monmouth County. This action concluded on July 9, 1982 pursuant to a Consent Order denying the prayer of such Complaint and fixing the lien of the Bank, such lien to attach to the proceeds of sale of such real property.

b. On February 9, 1982, John C. Maimone, acting as Debtor in Possession, filed a Complaint (Adversary No. 82–0251) for the purpose of having alleged lien holders Columbia Savings & Loan Assoc. ("Columbia"), Howell State Bank ("Howell"), and Beinhauer, Rouhana & Pike ("the Partnership") prove the extent and validity of their alleged liens. Following appointment of the Trustee on September 22, 1982, the Trustee joined the Debtor as plaintiff.

c. On June 21, 1983, the Trustee filed an additional Complaint (Adversary No. 83–0861) for the purpose of having the United States of America, Internal Revenue Service, Fidelity Union Bank, and various lien holders and judgment creditors of the Debtors prove the extent and validity of their alleged liens. This court entered

judgment fixing the liens of the United States of America, Internal Revenue Service on September 30, 1983 and of Fidelity Union Bank on September 8, 1983, and entered default judgments against all other defendants.

d. Finally, on February 14, 1984, the Trustee filed yet another Complaint (Adversary No. 84–0073) for judgment determining the extent and validity of alleged liens, specifically, the alleged first mortgage of Columbia and the alleged third mortgage, assigned to William J. Rouhana, Jr.

4. None of the mortgagees other than Citizens State Bank ever filed Complaints for relief from the stay with respect to the Marlboro property.

5. The encumbrances on the Marlboro property, in order of priority, are as follows:

a. Columbia is the holder of the first mortgage, recorded in the Monmouth County Clerk's Office on November 1, 1976. It is owed a principal balance of $295,454.28, an escrow balance of $1,016.67, and 10% simple interest which computes to a per diem rate of $81.22 from April 30, 1979 to the present, and monthly late charges of $133.48 from July 1, 1979 to the present. The monthly late charge is equivalent to 0.54% interest per annum. At this rate, the amount due on October 20, 1980, the date the petition was filed, would have been $342,384.21;[1] additional interest and penalties from then until January 23, 1984 were fixed by order of court entered May 3, 1984 at $96,229.99;[2] and additional interest and penalties from then until May 3, 1984 equal $8,737.14[3] for a total debt of $447,351.34 as of May 3, 1984.

b. Citizens is the holder of a second mortgage on the Marlboro property recorded on April 18, 1979 in the Office of the Clerk of Monmouth County. A Consent Order entered by this Court on July 9, 1982 fixed the amount due under this mortgage at $225,483.33, including principal of $150,-000, taxed costs of foreclosure action in the sum of $1,983.27, and interest from May 1, 1980 to June 22, 1982 in the sum of $75,-483.33, with a per diem charge thereafter of $81.25, representing 19.77% per annum of the principal balance. Citizens does not contend that this order is binding. *See* Ordin, *Finality of Order of Bankruptcy Court*, 54 Am.Bankr. L.J. 173 (1980).

Citizens State Bank obtained a judgment in foreclosure against real property on May 15, 1980, five months prior to the Debtors' petition, which had fixed the obligation at $155,179.47 plus taxed costs of foreclosure of $1,983.27 "together with lawful interest from May 1, 1980." The legal rate of postjudgment interest at that time was 8% per annum, or $34.45 per diem, N.J.C.P.R. 4:42–11(a) (Gann 1981 ed.); the interest rate was raised to 12% per annum or $51.67 per diem on September 14, 1981, N.J.C.P.R. 4:42–11(a) (Gann 1982 ed.). Calculated at this rate, the amount due on October 20, 1980, the date the petition was filed, would have been the sum of $163,122.59,[4] and the additional interest from then until May 1, 1984, the approximate date the Trustee paid Citizens for its pre-petition claim, would have been the sum of $60,937.25,[5] for a total of $224,059.84.

c. Howell State Bank held a third mortgage on the Marlboro property, recorded on June 12, 1979, which secured a principal obligation of $75,000 plus interest allegedly totaling $33,021.06 as of March 4, 1982 and per diem interest of $46.20 thereafter. This represents an interest rate of approximately 22.5% per annum. Howell assigned this mortgage to William J. Rouhana, Jr., a

---

1. $295,454.28 + $1,016.67 + (539 days × $81.22/day) + (16 months × $133.48/month) = $342,-384.21.

2. $438,614.20 – $342,384.21 = $96,229.99.

3. (101 days × $81.22/day) + (4 months × $133.-48/month) = $8,737.14.

4. $155,179.47 + $1,983.27 + (173 days × $34.45/day) = $163,122.59.

5. (329 days × $34.45/day) + (960 days × $51.67/day) = $60,937.25.

member of the Partnership, on November 15, 1983.

d. The Partnership holds the fourth mortgage on the Marlboro property recorded on June 28, 1979 which secures a principal obligation of $259,240.52.

e. In addition, Fidelity Union Bank holds a judgment lien entered on August 6, 1979, the amount of which was fixed at $458,639.17, in a consent order entered by the Court, as of August 15, 1983; the United States of America, Internal Revenue Service holds tax liens totaling $70,820.96, its first Notice of Tax Lien having been filed on August 20, 1979; and Howell State Bank holds a fifth mortgage in the principal amount of $25,000 recorded on February 27, 1980 in the Office of the Clerk of Monmouth County.

6. In Adversary Complaint No. 82–0251, in response to the Partnership's claim to the fourth mortgage on the Marlboro property, the Debtor-Plaintiff filed an amendment to its Complaint (styled as a "counterclaim" against the Partnership) alleging that the Partnership had obtained the mortgage and the accompanying $259,240.52 promissory note from him under duress. Debtor contends that while acting as the Debtor's legal counsel, the Partnership, a now-dissolved law firm, had allegedly threatened to obstruct an impending real estate closing unless the Debtors would execute a mortgage to the Partnership, ostensibly as security for payment of the Partnership's legal fees. This claim remains unresolved.

7. On September 30, 1982, the Partnership filed the present Motion to Abate Post-Petition Interest as to the first and second mortgages of Columbia and Citizens, primarily for the reason that it is inequitable to allow interest on the earlier mortgages to consume the entire value of the mortgaged property. The Partnership has also sought to compel Citizens to seek payment from sale of a liquor license it allegedly holds as collateral, prior to seeking payment from the Marlboro property, pursuant to the doctrine of marshaling of assets. Citizens refutes this on the ground that the liquor license is owned by parties other than the debtors. The license was held in the name of LaCollina, Inc., a corporation of which the debtors were at one time shareholders. The debtors, however, were not the sole shareholders of LaCollina and do not have an interest in the license.

8. On February 28, 1983, this Court entered a Consent Judgment permitting the Trustee to sell the Marlboro property free and clear of all liens, with any valid liens to attach to the proceeds of the sale, subject to administrative expenses to be fixed by the Court.

9. On April 11, 1983, the Trustee held an auction and, over the objections of several lienholders, confirmed the highest bid of $526,000.

10. On May 2, 1983, the Partnership filed a Motion to set aside the Trustee's sale. Citizens filed a certification in support of this motion on May 10, 1983.

11. On July 6, 1983, the Court entered an Order Vacating Sale and directed that the Trustee conduct another sale of the real property at public auction, after Beinhauer had guaranteed a minimum bid of $600,000.

12. At the resale held on November 18, 1983, the Marlboro property was sold for $820,000 and the sale was confirmed by the Trustee without objections by any party. The Trustee paid taxes in the amount of $106,685.18, auctioneer fees of $16,913.50, an advertising agency fee of $5,869.40, title insurance fees of $213.70, and property insurance fees of $2,894.00, leaving on hand the sum of $687,964.00 as of February 8, 1984, as set forth in the Certification of Roger Steffens, an associate of the firm of Gross and Novak, Esquires, attorneys for the Trustee. One third of the $25,863.60 costs of sale should be absorbed by Citizens, and the other two-thirds by Columbia, in proportion to the amounts of their recovery from the sale. 11 U.S.C. 506(c). If the Partnership were to recover any funds from the sale, it would also pay a proportional amount of the costs of sale.

13. On April 26, 1984, this court ordered the Trustee to pay Citizens State Bank the sum of $163,752.00, representing the amount due on the date the petition was filed. This Order unintentionally overstated the amount due as of that date by $629.41, because the amount of the foreclosure judgment for $155,179 was misread as $155,779. The court also ordered the Trustee to pay the pre-petition debt due to Columbia upon entry of a Judgment fixing such lien.

14. After payment of the sum of $163,122.59 pre-petition debt to Citizens and the sum of $342,384.21 pre-petition debt to Columbia, for a total of $505,406.80, the Trustee would have on hand the sum of $182,557.70, plus any interest which may have accrued on the proceeds of the sale. Post-petition interest on the first and second mortgages, if allowed, would approximate $173,398.43, plus interest on proceeds of sale until payment. Pursuant to Section 362(a) of the Bankruptcy Code, the Trustee is entitled to a fee of approximately $7,880, 11 U.S.C. sec. 326(a), and The Trustee's attorney is entitled to repayment of costs of sale under the Consent Order of February 28, 1983, *see* para. 8 *supra.* These charges will be paid by the parties proportionately, and being minimal, they would not significantly reduce any payment to the third mortgagee. The remaining funds may be consumed, however, by attorneys' fees to be paid to the first and second mortgagees pursuant to Section 506(b) of the Bankruptcy Code, in which case the Partnership would receive no payment on its claim.

*Discussion*

The Partnership seeks on this motion to abate the post-petition interest allowed to the first and second mortgagees, in whole or in part, alleging that it will be inequitable to allow post-petition interest to consume the entire value of the property while the third mortgagee is unable to collect any part of its principal debt. The Partnership also suggests that it is equitably entitled to some payment from the property in view of its successful challenge to the Trustee's

original sale of the property for $526,000, which eventually resulted in a resale of the property for $820,000. In addition, it argues that the doctrine of marshaling of assets requires Citizens to seek payment from other assets prior to seeking payment from the proceeds of sale of the Marlboro property.

I.

The Court must first determine what the proper rate of interest payable to Citizens and Columbia would be *in the absence of unusual equitable considerations.* This issue is governed, although not satisfactorily answered, by section 506(b) of the Bankruptcy Code, which states:

"To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose." 11 U.S.C. sec. 506(b).

It should be emphasized that in a reorganization proceeding, section 506(b) of the Bankruptcy Code governs the accrual of interest on a pre-petition debt only after the date of the petition and before the effective date of the plan. *In re Webb,* 29 B.R. 280, 286 (Bankr.E.D.N.Y. 1983). The discount factor to be used for "cramdown" purposes, after the effective date of the plan, is governed by sections 1129(b)(2)(A)(i)(II) and 1325(a)(5)(B)(ii). A number of cases cited by the Partnership have mistakenly looked to section 506(b) of the Bankruptcy Code to determine the interest rate to be applied for "cramdown" purposes. *In re Marx,* 7 B.C.D. 1066, 11 B.R. 819 (Bankr.S.D.Ohio 1981); *In re Minguey,* 7 B.C.D. 691, 10 B.R. 806 (Bankr.W.D.Wis. 1981); *see* 3 *Collier on Bankruptcy* sec. 506.05 at 506–37 (15th ed. 1983).

The great majority of courts have concluded that secured creditors are entitled to post-petition interest at the contract rate. *See In re Loveridge,* 36 B.R. 159, 11 B.C.D. 485, 487 (Bankr.D.Utah 1983) (and cases

cited); 3 *Collier on Bankruptcy* sec. 506.-05 at 506–36 (15th ed. 1983); a minority have suggested that under section 506(b) of the Bankruptcy Code the secured creditor may be limited to a lower rate of interest, *see In re Marx* and *In re Minguey, supra.* Many commentators and courts, including this court, have entered into a grammatical analysis of section 506(b) of the Bankruptcy Code, hoping to discover the true Congressional intent. The comma, after the phrase "interest on such claim," does seem intended to separate that phrase from the modifying clause "provided under the agreement under which such claim arose." A number of courts have viewed this comma as proof that oversecured claim holders are not necessarily entitled to the contract rate of interest. *In re Minguey* and *In re Marx, supra*, upon which the Partnership relies, both drew this reasonable conclusion, although in the cramdown context. *In re Loveridge, supra*, offered another interpretation of the grammatical structure, and determined that separation of the two phrases by a comma was necessary only to indicate that oversecured claim holders would be entitled to interest even in the absence of an agreement between the parties, particularly on tort and other noncontractual claims. 36 B.R. 159, 11 B.C.D. at 487. *Collier*, on the other hand, posits that the comma was actually inserted to separate the word "claim" from "any reasonable fees, costs, or charges;" without the comma, the section may have been read to require interest not only on the claim but also on fees, costs and charges. 3 *Collier on Bankruptcy* sec. 506.05 at 506–36 (15th ed. 1983). In view of the many meanings which may be read into this sentence, this court concludes that the placement of a comma is simply too unreliable a source from which to deduce Congressional intent as to the proper rate of interest to be awarded on oversecured claims. "An interest rate should not be chosen by juggling rules of grammar." *In re Loveridge*, 36 B.R. 159, 11 B.C.D. at 487. To determine the proper rate of interest, courts must instead rely on the policy considerations underlying the Bankruptcy Code and commercial law in general.

Admittedly, these principles do not forcefully compel either the contract rate of interest, a market rate, the legal rate, or any other particular interest rate. In general, however, it is appropriate for oversecured creditors to be allowed the contract rate of interest partly for the reasons stated in *In re Loveridge, supra:*

> "(R)ejecting the contract rate where there is a contract might mean either a windfall to the creditor when the contract rate is less than the rate selected or a windfall to the debtor when the contract rate exceeds the rate selected .... The parties in this case have shown no good reason for producing a windfall under Section 506(b)." 36 B.R. 159, 11 B.C.D. at 487.

In a reorganization, however, a windfall is inevitable whenever the market discount rate, which becomes effective upon confirmation of a plan of reorganization, differs from the contract rate. *See In re Loveridge, supra* (chapter 11); *In re Busman*, 6 B.C.D. 683, 5 B.R. 332 (Bankr.E.D.N.Y. 1980) (chapter 13); Blum, *Treatment of Interest on Debtor Obligations Under the Bankruptcy Code*, 50 U.Chi.L.R. 430, 441 (1983); *but see In re Kauffunger*, 16 B.R. 666, 668–69 (Bankr.D.N.J.1981) (DeVito, J.) (chapter 13; contract rate). The basic question involves the optimal timing of this windfall, and whether it should occur upon filing of the petition or upon confirmation. The anticipated windfall may have distorting effects either upon the decision to file a petition for relief or upon a creditor's incentive to prevent confirmation of a plan, but overall such distortion, caused by the anticipated change in the rate of interest, will normally be outweighed by other factors in the process. Such a change in creditors' rights is more justifiable upon the successful confirmation of a plan than upon the mere filing of a petition, and the court therefore holds that in general, the proper rate of interest under section 506(b) of the Bankruptcy Code is the rate provided by the contract: that is, the rate to which the

creditor was entitled immediately prior to the petition, and to which it would have been entitled in the absence of the petition.

█ Absent contrary equitable considerations, which will be considered presently, Columbia is therefore entitled to post-petition interest of 10.54% as provided in its contract and in the Consent Order entered May 3, 1984. Prior to filing of the petition, however, Citizens' contract rights to interest against the Debtor were merged into the foreclosure judgment recovered on May 15, 1980, and it was subsequently entitled only to the legal rate of interest as provided by N.J.C.P.R. 4:42–11(a) (Gann 1984), now 12%. Obviously, Citizens is entitled only to this rate (absent contrary equitable considerations), so that there is no reason in bankruptcy law to return it to the previous contract rate upon filing of the petition.

## II.

The primary issue raised by this motion is whether equitable considerations would require or allow this court to reduce or eliminate post-petition interest accruing to the senior secured creditors pending payment of all or part of the Debtor's principal obligation to the Partnership. Citizens, the second mortgagee, concedes that payment of post-petition interest to creditors is subject to equitable considerations pursuant to the Supreme Court's decision in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), but contends that the circumstances in this case are not so extreme as to justify abatement of interest.

The Partnership offers several reasons in support of its claim that equitable considerations call for the abatement of post-petition interest as to the senior secured claims. (A) The Partnership suggests that senior secured creditors should always be denied post-petition interest until junior secured creditors have been paid the principal amount of their claims, for the reason that the right to adequate protection with respect to a pre-petition debt is superior to the right to adequate protection for post-

petition interest, even as to a superior secured claim. *See* O'Toole, *Adequate Protection and Postpetition Interest in Chapter 11 Proceedings*, 56 Am.Bankr.L.J. 251 (1982). (B) The Partnership suggests that the senior secured creditors have intentionally or negligently allowed and encouraged the long delay during which accruing interest eliminated or almost eliminated any equity remaining for the junior secured creditors. *See Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir.1959). (C) The Partnership lastly argues that because of its instrumental role in having the original $526,000 sale of this property vacated and in securing another sale, at which the same property was sold for $820,000, it is only fair that it should receive some of the benefit from the resale. *See Lindy Bros. Builders, Inc. v. American Radiator & San. Corp.*, 540 F.2d 102, 110 (3d Cir.1976).

### A.

As explained in *Vanston, supra,* the general rule in bankruptcy is that creditors are not entitled to post-petition interest primarily for two reasons:

"Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputations of interest causing recomputation of claims could be avoided. Moreover, different creditors whose claims bore diverse interest rates or were paid by the bankruptcy court on different dates would suffer neither gain nor loss caused by delay." 329 U.S. at 164, 67 S.Ct. at 240.

Two major exceptions have attached to the rule against post-petition interest: the first, now codified in section 506(b) of the Bankruptcy Code, is that oversecured creditors are entitled to post-petition interest to the extent of their interest in the security; the second, now codified in section 726(a)(5) of the Bankruptcy Code for purposes of chapter 7 of the Bankruptcy Code (liquidations), is that all creditors are entitled to post-petition interest from a solvent, liquidating Debtor. The policy against post-petition interest in other circumstances is

best explained by this statement in *Vanston:*

> " 'The delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate.' (Quoting from) *Thomas v. Western Car Co.,* 149 U.S. 95 [13 S.Ct. 824, 37 L.Ed. 663] (1983) ... Courts have felt that it would be inequitable for anyone to gain an advantage or suffer a loss because of such delay."

The same reasoning, contends the Partnership, supports the denial of postpetition interest to senior secured creditors pending payment of principal to junior secured creditors. Even when unsecured debenture holders have priority over other debenture holders, they are not entitled to post-petition interest (absent a surplus). *See* 11 U.S.C. sec. 502(b)(2) (disallowing claims for unmatured interest). Similarly, contends the Partnership, in the interest of equality of distribution of the benefits and burdens of bankruptcy, secured creditors should be denied post-petition interest until all are paid their pre-petition claims, regardless of priority. One commentator supports the Partnership's claim, in fact, stating that "(t)here is certainly no reason intrinsic to the phenomenon of credit that entitles oversecured creditors to interest out of their collateral before junior creditors, *whether secured or unsecured,* receive any of their principal." O'Toole, *Adequate Protection and Postpetition Interest in Chapter 11 Proceedings,* 56 Am.Bankr.L.J. 251, 253 (1982) (emphasis added).

For two reasons, the court rejects the analogy between unsecured and secured creditors. First, the property rights of a secured claim holder are viewed as more substantial and entitled to greater protection than those of unsecured creditors, thus justifying greater protection to senior secured claim holders than to senior unsecured claim holders. *See* 11 U.S.C. 361, 362(d), and 363(e) (all of which require adequate protection for the property of secured claim holders); *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (noting that security interests are entitled to greater constitutional protection than unsecured claims). Second, the United States Supreme Court has frequently stated in dictum that "principal as well as interest ... is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full." *American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway,* 233 U.S. 261, 34 S.Ct. 502, 58 L.Ed. 949 (1913). *See also Wolohan Lumber Co. v. Robbins,* 21 B.R. 747, 751 (Bankr.S.D.Ohio 1982):

> "(T)he prevailing rule which emerged was (that) proceeds from the sale of a security should be applied to the satisfaction of interest accruing after the petition filing in the same priority as that assigned to the prepetition arrearages."

*See also* Annot., 27 A.L.R.2d 586, 596 (1953).

In *American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway, supra,* a receiver had paid interest accruing during the receivership to a mortgagee but had declined to pay such interest to a superior statutory lien holder. The United States Supreme Court held that if interest were to be paid to the mortgagee it must first be paid to the superior lienor. This holding does not specifically determine whether interest must be paid in full on the superior secured claim before any payment to the inferior claim holder, but the Court addressed this in dictum:

> "The principle is not limited to cases of technical bankruptcy, where the assets ultimately prove sufficient to pay all debts in full, but principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, *even though what remains is not sufficient to pay claims of a lower rank in full."* 233 U.S. at 267, 34 S.Ct. at 505 (emphasis added).

This dictum was followed in *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 515 n.4, 527, 61 S.Ct. 675, 680 n.4, 685, 85 L.Ed. 982 (1940), in which the Court declined to confirm a Plan of Arrangement on the ground that it sought to extinguish

post-petition, pre-confirmation interest claims, stating, "This interest is entitled to the same priority as the principal." Again, this case did not necessarily determine whether a senior secured creditor must be paid all accrued post-petition interest even at the expense of a junior secured creditor's principal claim. *See also Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 318 U.S. 523, 546, 63 S.Ct. 727, 740, 87 L.Ed. 959 (1942) (post-petition interest "was entitled to the same priority as the principal"). *But see Lerner Stores Corp. v. Electric Maid Bake Shops,* 24 F.2d 780 (5th Cir.1928).

▊ This court therefore concludes that, at least as a general rule, senior mortgagees are entitled to post-petition interest before junior mortgagees may collect principal from the same security. The court must also consider the effect of the other special circumstances on which the Partnership relies: the alleged responsibility of the first two mortgagees for the delay in selling this property, and the credit due to the Partnership for obtaining a resale of the property which resulted in a 60% increase in the amount of the recovery from the property.

### B.

In analyzing the validity of this argument, it is instructive to review the unusual cases in which courts have denied or reduced interest on oversecured claims. The leading case, of course, is *Vanston, supra.* In *Vanston,* the contract of the secured creditor provided for payment of interest on any overdue interest, as well as on the principal amount due. While the Court allowed post-petition interest on the principal debt, it denied interest upon post-petition interest, reasoning that because the court itself had ordered the Debtor not to pay interest during pendency of the proceedings, it would be inequitable to impose an interest penalty on the Debtor for following the court's order; the Court did not view the interest payments as mere compensation for the Debtor's use of funds

owing to the Creditor. Most important, the Court stated:

"It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." 329 U.S. at 165, 67 S.Ct. at 241.

Following *Vanston,* numerous lower courts applied equitable principles to vary the interest rate allowed on secured claims. The major Third Circuit case following *Vanston* is *In re Magnus Harmonica Corp.,* 262 F.2d 515 (3d Cir.1959). The lender in that case had wrongly imposed charges of over $22,000 on the debtor, pre-petition, and because the debtor had not made timely objections as required under the contract, it was bound to pay the excessive charges. The court held that the Trustee was likewise unable to avoid these charges but, because of the secured creditor's wrongful action, denied all post-petition interest on the *entire* claim.

A later case reveals, however, that in this Circuit the application of equitable principles is not unrestrained. In *In re Advance Printing & Litho Co.,* 277 F.Supp. 101 (W.D.Pa.1967), *aff'd per curiam,* 387 F.2d 952 (3d Cir.1967) (adopting district court opinion), the debtor had obtained a loan of $20,000 in return for a promissory note providing for total payments to the lender of $26,000 over three years plus an addition 6% per annum. The loan was fully secured by the bankrupt's machinery and equipment. The Referee in Bankruptcy held:

"There were therefore no risks undertaken by the creditor which would support consideration of an allowance to it of more than the usual legal rate of interest as against the claims of unsecured creditors involved in this bankruptcy distribution under the equitable principles uniformly held applicable in such cases." Quoted at 277 F.Supp. at 103.

The Referee therefore subordinated the additional $6,000 charge to all general unsecured claims, in effect disallowing it, in

reliance on *Vanston* and *Magnus.* The United States District Court for the Western District of Pennsylvania reversed, and was affirmed by the Third Circuit Court of Appeals. The District Court found that "(t)he authorities relied upon by the Referee in his application of equitable principles to the controversy at bar involved factual situations much more extreme than that here encountered." 277 F.Supp. at 103.

Two other cases are worthy of note. In *Ruskin v. Griffith,* 269 F.2d 827, 832 (2d Cir.1959), the Second Circuit Court of Appeals held enforceable in bankruptcy a contractual clause providing for enhanced interest upon default, and stated:

"(W)here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act."

Similarly, in this case, the Partnership was well aware that its bargained-for junior mortgage would not accord it protection against the accrual of interest in the event of long delay in payment. Finally, a junior mortgagee made precisely the argument advanced by the Partnership in this case in *Wolohan Lumber Co. v. Robbins,* 21 B.R. 747, 751 (Bankr.S.D.Ohio 1982) (emphasis added). The *Wolohan* court stated:

"The Court is cognizant that, since payment of post-petition interest operates to deplete funds which would otherwise be available for subordinate creditors, equitable considerations may be invoked to prevent undue prejudice to junior creditors. *See Matter of New York, New Haven and Hartford R. Co.,* 4 B.R. 758, 798–99 (Bankr.D.Conn.1980), and citation therein. The Court is of the opinion, however, that such equitable power is discretionary, and should only be exercised upon a showing of *extreme circumstances,* which are not indicated by the record *instanter* ...."

*See also Fox v. Peck Iron & Metal Co.,* 25 B.R. 674, 694–95 (Bankr.S.D.Calif.1982) (reduced usurious rate to legal rate).

In the present case, therefore, it might possibly be appropriate to abate interest to the first and second mortgagees if they were responsible for inordinate delay in selling the property at issue. On the contrary, however, they have diligently sought from the beginning of this case to recover the funds to which they were entitled. Citizens, indeed, was primarily responsible for appointment of the Trustee which led to liquidation of the subject property. It is a rare oversecured creditor who would not prefer immediate liquidation of the Debtor's estate; one who exercises patience or chooses not to overburden the Debtor with endless motion for relief from the stay, etc., should not be penalized for not having pressed for liquidation as much as a junior secured creditor might have desired. Neither of the senior creditors would have been entitled to relief from the stay, as both were adequately protected and have been fully paid for their pre-petition debt. It would be an unusual case in which a junior secured creditor could satisfactorily prove that the senior creditor intentionally lengthened the proceedings in order to collect interest at the expense of a junior creditor. The Partnership has by no means so proved in this case.

C.

As for the allegation that it is equitably entitled to some of the differential in price between the first and second sales of the property, the Partnership again stands on weak ground. If the Partnership had not been the first party to file the motion to vacate the first sale, the court can only assume that Citizens would have done so. The most that the Partnership could be entitled to under this argument would be its attorneys' fees expended in the motion itself, under the equitable fund doctrine. As explained by the Third Circuit Court of Appeals in *Lindy Bros. Builders Inc. v. American Radiator & San. Corp.,* 540 F.2d 102, 110 (3d Cir.1976) (*Lindy II*):

"Federal courts have long recognized 'the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for

984

the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit.' *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257 [95 S.Ct. 1612, 1621, 44 L.Ed.2d 141] (1975); *see, e.g., Sprague v. Ticonic National Bank*, 307 U.S. 161 [59 S.Ct. 777, 83 L.Ed. 1184] (1939); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, [5 S.Ct. 387, 28 L.Ed. 915] (1885); *Trustees v. Greenough*, 105 U.S. 527 [26 L.Ed. 1157] (1881). *See generally* 7A C. Wright & A. Miller, Federal Practice and Procedure (sec.) 1803 (1972); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv. L.Rev. 1597 (1974) (hereinafter cited as Dawson). As we said in *Lindy I*, '(t)he award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed.' 487 F.2d at 165. Accordingly, 'a benefit to the fund is supposedly required. ... The standard formula (of benefit) ... mix(es) together three distinct ideas: that a fund can be benefited by being "created, increased or protected" (or "preserved").' " Dawson at 1626.

■ The court concludes that it would be inappropriate to apply the equitable fund doctrine to a complex and protracted bankruptcy proceeding in which many parties have at various times advanced many Motions, Complaints, and positions. It is true that Citizens did benefit substantially from the time expended by the Partnership's attorneys in having the first sale vacated. It is also true, however, that the Partnership may have been benefited by various actions taken by the attorneys for other parties involved in this case, such as the motion by Citizens for appointment of a Trustee. This doctrine would encourage intermeddling by parties having a slight contingent interest in a case in the hope that they might be permitted to recover attorneys' fees for the efforts. It is preferable, in the

bankruptcy context, to have each party represent its own interests without such a distortion in incentives. Doubtless, the equitable fund doctrine may be applicable in an unusual case, but this is not such a case.

### III.

■ Finally, the Court rejects the Partnership's marshaling of assets argument for the reason that the liquor license on which Citizens allegedly holds a lien is owned by parties other than the Debtors. The doctrine of marshaling of assets requires that when two parties hold a lien on property, the senior secured creditor must first seek payment from any other property held as security. *See Johnson v. Lentini*, 66 N.J. Super. 398, 409, 169 A.2d 208 (Ch. Div.1961); Karasik and Kolodney, *The Doctrine of Marshaling Under the Bankruptcy Code*, 89 Comm. L.J. 102 (1984). This doctrine obviously cannot be applied, however, when the other asset is also owned or liened by parties other than the debtor. *See In re Harrold's Hatchery & Poultry Farms, Inc.*, 8 B.C.D. 995, 997, 17 B.R. 712 (Bankr. M.D. Ga.1982). If Citizens first seeks payment from the Marlboro property, the Partnership will be harmed, but if it first seeks payment from the liquor license, the present owners of the license will be harmed. Neither has a stronger equitable claim in this case. Citizens may therefore seek payment from its secured property in whatever order it may choose.

### Conclusion

For the reasons above stated, the Partnership's Motion for Abatement of Post-petition Interest to the first and second mortgagees should be denied. Citizens should submit an order consistent with this opinion.

As this resolves the final question relating to the proper payments to the first two mortgagees, Columbia should promptly submit an order providing for payment of the amount remaining due to it, consistent with the amounts calculated in para.5a of the Facts section, *supra*, and in the Con-

sent Order of May 3, 1984. Citizens should submit an order providing for payment of the amount remaining due to it, consistent with the amounts calculated in paragraphs 5b and 13 of the Facts section, *supra*. The Partnership may attempt to prove the validity of its third mortgage on the subject property, so that after payment from the proceeds of sale of the Marlboro property to the first two mortgagees and payment of counsel fees as allowed by the Court, the remainder, if any, will be paid toward the proved and allowed third mortgage.